[Civ. No. 20123.  Second Dist., Div. Three.  Dec. 21, 1954.]

EARL G. BIEG, Respondent, v. JENNINGS B. SHAMEL et al., Appellants.

H. P. Babson and John C. Goff for Appellants.

Clifford A. Rohe, Gross & Svenson and Harold W. Svenson for Respondent.

WOOD (Parker), J.—Action by real estate broker to recover commission allegedly due him from defendants. Judgment was for plaintiff in the sum of $15,429.37 ($13,500 plus interest). Defendants appeal from the judgment.

Defendants, husband and wife, owned certain real property in Los Angeles County known as the Shamel Ranch. On April 2, 1950, defendant Jennings B. Shamel signed, and de-

livered to plaintiff, a listing agreement which provided that plaintiff had the exclusive right until May 5, 1950, to sell the Shamel Ranch for $200,000; that Shamel would pay to plaintiff, as commission, 7½ per cent of the selling price "on any deal accepted by" Shamel. At the time of receiving the listing, plaintiff had a prospective purchaser by the name of R. W. Alcorn.

Thereafter plaintiff prepared a document, which bears the date May 3, 1950, entitled "Offer to Purchase."[1] Said document (Exhibit B) recited in effect that Alcorn offered to purchase the ranch for $200,000, and would pay $58,000 on or before September 1, 1950, and would deliver a first and a second trust deed to secure payment of the balance of the purchase price. The document was signed by Alcorn, but the record does not show when he signed it. The bottom portion of said document was entitled "Acceptance," and it was signed by defendants on June 1, 1950. It recited, in part, that de-

---

[1] "OFFER TO PURCHASE

"EARL G. BIEG
13531 Ventura Boulevard
Sherman Oaks, California

May 3     1950

"Dear Sir:

"I hereby offer to purchase the following property situated in Los Angeles County, California, to wit: Shamel Ranch in Las Virgines Canyon on Las Virgines Canyon Rd. free and clear of all liens, indebtedness, claims of every kind, except those noted below, but subject to all restrictions, reservations, conditions and rights of way of record, and agree to pay, therefore (sic), the sum of $200,000.00 as follows:
$ — — — deposit herewith, $58,000.00 on or before Sept. 1, 1950 and bal. 1st T.D.—$75,000. pay. $7500. &/or more 9-1-51 plus 5% int., $7500. &/or more plus 5% int. on 9-1 each yr. thereafter until paid in full, 2d T.D.—$67,000. pay. $25,000. plus 5% int. 1-5-51, $4200. &/or more plus 5% int. on 1-5 each yr. Thereafter until paid in full.

"I herewith deposit with you the sum of $ — — — . If, before midnight of June 1, 1950 you obtain the acceptance of the owners of the above property to this offer, I will, by 9-1-50 deposit in escrow the cash above mentioned, execute all papers and documents and do everything else necessary to fully comply with this agreement upon my part to be performed. Such money and papers are to be so deposited in an escrow which you are authorized to open anywhere you desire. The cash and documents are to be used only when the owners, at their cost, furnish me, through such escrow, with a policy of Title Insurance of a reputable company showing the title to the property as above mentioned, and upon the transfer and conveyance of such property to me, or my nominee.

"I will pay the usual purchaser's share of the escrow and other charges. All income, rents, utility, charges, taxes and insurance are to be prorated as of the close of escrow.

"If you do not obtain the owner's acceptance of this offer within such period, upon the terms and conditions herein mentioned or such others

fendants agreed to pay plaintiff ''7½% commission if we dispose of such property to the maker of such offer, or his nominee, within six (6) months from the date hereof. . . .''

Alcorn and defendants also signed escrow instructions, dated May 6, 1950, in which it was provided that the total consideration for the property was $200,000; Alcorn would deliver ''through escrow'' $58,000, provided that on or before September 1, 1950, instruments were filed for record which would entitle the escrow agent to procure a policy of title insurance; Alcorn also would deliver to the escrow agent a first trust deed as security for a note dated May 6, 1950, for $75,000 in favor of defendants, and a second trust deed to secure another note dated May 6, 1950, for $67,000 in favor of defendants. The instructions also provided that defendants would ''Pay at close of escrow . . . the following: Pay [real estate brokers'] commission of $3333.33 to Bill Keim . . . $3333.33 to Evelyn Tate . . . $8333.33 to Earl Bieg. . . .'' (It was stipulated at the trial herein that plaintiff, by reason of an assignment, was entitled to any commission which may be due.)

---

as the owner and I may agree upon, the above deposit shall be immediately returned to me. If you do obtain such consent, and I fail to comply with each and all of the terms and conditions hereof on my part to be performed, you shall retain from such deposit the full amount of the commission to which you are entitled as the owner's agent, and the balance shall be held by you until the owners and I agree upon its disposition.

''Time is the essence hereof. Bill of sale to all personal property will be given by seller but no inventory. I have inspected land, bldgs., and water on the 640 ac., more or less, and accept said property as is. All furn. & equip on the ranch as of this date are to be included.

| Address | | Purchaser | R. W. Alcorn |
|---|---|---|---|
| Phone | | Purchaser | |
| | | | R. W. Alcorn |

''ACCEPTANCE

''We are the legal owners of the above described property, and agree to sell the same to _____ or his nominee, upon the terms and conditions above mentioned. We will pay the owner's share of the escrow charges, revenue stamps and all other usual owner's expense.

''We agree to pay EARL G. BIEG 7½% commission if we dispose of such property to the maker of such offer, or his nominee, within six (6) months from the date hereof, on any terms or conditions, even if EARL G. BIEG does not consumate (sic) the transaction.

| Address | | Owner | J. B. Shamel |
|---|---|---|---|
| Phone | | Owner | Ruth T. Shamel |
| | | Date | June 1 - 1950 '' |

After the documents, above mentioned, were executed Alcorn moved to, and took possession of, the ranch. The record does not show when he moved to the property but it does show that he was residing there in July, 1950, and that he resided there until January 15, 1951. Defendants thereafter took possession of the property.

Alcorn did not pay any part of the $58,000 to the escrow agent or to defendants, and he did not perform any of the conditions of the escrow instructions or of the offer and acceptance agreement. He did pay $1,500 (outside escrow) to plaintiff on October 19, 1950. Plaintiff applied the $1,500 on his claim for commission in the amount of $15,000.

On March 18, 1952, plaintiff commenced this action to recover $13,500, the amount allegedly due as commission. He alleged in the complaint that prior to May 3, 1950, he was employed by defendants to procure a purchaser of the Shamel Ranch; on May 3, 1950, he procured Alcorn as a prospective purchaser of the property for $200,000; Alcorn executed a written offer to purchase the property and defendants accepted said offer in writing; pursuant to the terms of the agreement, the defendants and Alcorn on May 6, 1950, opened an escrow and executed escrow instructions; thereafter Alcorn with permission of defendants went into possession of the property, operated the ranch for his own benefit, constructed improvements thereon and paid plaintiff $1,500 outside of escrow to apply on the purchase price of the property; about November, 1950, Alcorn and defendants orally agreed to cancel the transaction and Alcorn redelivered possession of the property to defendants; the agreed commission of 7½ per cent amounting to $15,000 became due from defendants to plaintiff on May 3, 1950, the date of the sale, and no part of said amount has been paid except the sum of $1,500 leaving a balance of $13,500 now due and unpaid. (A copy of the listing, a copy of the offer and acceptance agreement, and a copy of the escrow instructions, were attached to and made a part of the complaint.)

Defendants filed an answer in which they admitted that they accepted the written offer to purchase but alleged that said offer was accepted conditionally and that no condition therein was complied with by Alcorn; admitted that Alcorn went into possession of the property and operated the ranch, but denied that Alcorn made any payments on account of the purchase price, "or with their [defendants'] knowledge or consent." As an affirmative defense, they alleged therein that

on May 3, 1950, plaintiff presented to defendants a written offer, Exhibit B, to purchase the property which offer was signed by Alcorn; said document and the escrow instructions were prepared by plaintiff; in order to obtain defendants' conditional acceptance of said offer the plaintiff stated to them that he knew Alcorn, that by reason of plaintiff's former banking connections he had confidential information that Alcorn was tremendously wealthy, that Alcorn was going to organize the ranch for underprivileged boys and there was considerable money available other than the money of Alcorn; plaintiff also stated that Alcorn had a $200,000 trust fund and had made millions of dollars in the wheat market; plaintiff also stated that it was desirable to accept the proposal of Alcorn and give him possession of the ranch immediately because a man in his position could not thereafter afford to back down; plaintiff represented that said agreement would not obligate defendants to pay any commission unless said sale was completed and defendants received the purchase price of the property; defendants relied upon the representations made by plaintiff and executed the agreement, Exhibit B; said representations were false and were known by plaintiff to be false at the time they were made.

The court found, in part, as follows: On May 3, 1950, "plaintiff procured one R. W. Alcorn as a prospective purchaser" of the Shamel Ranch at a price of $200,000, and that Alcorn thereupon executed a written offer to purchase the property, and on June 1, 1950, defendants accepted the offer to purchase. Exhibit B is a copy of said offer and acceptance, and delivery of said document was made by said parties to plaintiff. Pursuant to said offer and acceptance, Alcorn and defendants opened an escrow and on May 6, 1950, defendants executed escrow instructions, which instructions were thereafter signed by Alcorn and delivered to the escrow company. Immediately thereafter Alcorn, with the permission of defendants, entered into possession of the property, operated the ranch located thereon for his own benefit, made improvements thereon, and in October, 1950, paid $1,500 to plaintiff outside of escrow to apply on the purchase price of the property. Plaintiff performed all the conditions of the contract, set forth in his complaint, on his part to be performed. Commission of 7½ per cent, amounting to $15,000, became payable by defendants to plaintiff on the date of the sale which was June 1, 1950, the date of the execution of the acceptance by defendants. Plaintiff received $1,500 in October, 1950,

from Alcorn on account of commission, and the balance of the commission of $13,500 has not been paid. Alcorn failed to pay $58,000 in escrow on September 1, 1950, and defendants, "granted an extension for the payment thereof." The escrow has not been closed. The offer to purchase was presented to defendants on June 1, 1950, and not on May 3, 1950. The court found further, as to allegations of the affirmative defense of the answer, that it is true that plaintiff stated to defendants in effect that Alcorn was connected with the production of a motion picture; that plaintiff stated to defendants he had received information from Alcorn's broker, and from a credit report of a bank, to the effect that Alcorn owned a large home in Kansas, had been active in the wheat market, had an interest in a motion picture, and appeared to be wealthy; that plaintiff also told defendants that he had not read the bank report, he knew nothing of the truth thereof, and he "was relaying it to the defendants for what it might be worth"; and it was not true that defendants executed the agreement in reliance upon the representations made by plaintiff.

Plaintiff testified in part as follows: On February 5, he saw defendant Mr. Shamel (referrd to herein as defendant) for the first time when he went to defendant's office and told him that he (plaintiff) would like an "exclusive" listing of the Shamel Ranch—that he had someone as a prospect, who "was a big producer [of motion pictures]" and he (plaintiff) understood that the prospect had made considerable money in the wheat business in Kansas. Defendant gave him an exclusive listing for 20 days, to February 25, 1950. Plaintiff showed the ranch to two men who were representing Alcorn, the prospect. On February 26, 1950, one of the men told plaintiff that Alcorn had been to the ranch and was going to make a deal. On February 27, 1950, defendant told plaintiff by telephone that Alcorn came to the ranch on the 25th, that defendant then went to Alcorn's office and they "shook hands" on a deal. Plaintiff stated that they would have to get papers signed and get a deposit. Defendant told plaintiff to make out the papers but not to insist on any particular amount as deposit because he did not know whether he could get a cash deposit. Thereafter defendant told plaintiff not to put too much pressure on Alcorn, that he was temperamental and defendant might lose the deal. Plaintiff replied that "Until we get something signed and a deposit we don't have any deal." Later, plaintiff

told defendant "that the smartest thing for us to do" is to get a deposit from Alcorn. In April plaintiff called defendant and told him that a friend of plaintiff, "a broker who was in the deal," said that he had read a report on a banker's desk which purported to be a report on Alcorn; that the report stated that Alcorn had a $200,000 trust fund and had made a lot of money in wheat; and plaintiff also said that he had not see the report and knew nothing about it. During the latter part of April, 1950, defendant told plaintiff that he was buying a ranch up north and "wanted this paper to use on the purchase of that ranch," and for plaintiff to get some kind of papers signed and that he (defendant) did not care anything about a cash deposit. Thereafter defendants and a man from the escrow company prepared the escrow instructions, and defendant and his wife signed them. Said instructions and an offer and acceptance agreement (Exhibit B) were sent to Alcorn's attorney and were signed by Alcorn. Then the instructions were sent to the escrow company and the offer and acceptance agreement was returned to plaintiff. Plaintiff then took the offer and acceptance agreement to defendants' home where defendant and his wife signed the acceptance. Thereafter defendant told plaintiff that Alcorn wanted to move to the ranch, and plaintiff said "no." Defendant said he did not see how it would hurt anything—that he was not using the ranch and it was not being operated. Plaintiff then said that it was up to defendant but that plaintiff would not do it. Plaintiff testified further that: During the early part of June, 1950, he left town and was gone until the latter part of September, 1950. When he returned he went to the ranch and that was the first time he knew Alcorn had gone into possession. All the transactions up to this date were between Alcorn and defendant. During the second week of October, 1950, at plaintiff's request, Alcorn and defendant came to plaintiff's office for a meeting. Plaintiff told them that he would like to get the deal straightened up but if they were going to deal together they should pay him his commission and then they could do what they wanted to. Alcorn stated that he would have it (money for commission) there in a few days. Plaintiff called another meeting at which defendant and Alcorn were present, and defendant said that "there was no question but that plaintiff's commission was due and should be paid." Alcorn agreed to bring $5,000 to plaintiff within two days and $10,000 within ten days. Subsequently, Alcorn sent a check to plaintiff for $1,500.

Defendant testified in part as follows: In April, 1950, plaintiff asked him for a renewal of his listing or an additional listing, claiming that he had a deal with Alcorn who would pay $200,000 cash for the ranch. Plaintiff said that Alcorn was many times a millionaire, had made millions in the wheat market, was a large producer in the movie industry, and had a $200,000 trust fund. Defendant then gave plaintiff another listing dated April 2, 1950 (Exhibit A). In a later conversation with plaintiff, defendant said that he wanted plaintiff to show good intention "by opening an escrow with some money in it," and plaintiff said that he had not been able to get any money from Alcorn. Thereafter plaintiff asked defendant to sign the offer and acceptance (Exhibit B) and stated that he had access to information that the average person did not have because of his former bank experience, that he knew Alcorn had a lot of money and the signing of the agreement would be equal to money in escrow. Defendant told plaintiff that he would not assume the chore of completing the deal or collecting the money. When defendant and his wife signed the acceptance, the offer had not been signed by Alcorn. At the beginning of the transaction plaintiff suggested that inasmuch as defendant was not operating the ranch that it "would have a great influence in Alcorn's completing the deal if he would let him take over the ranch"; it would relieve defendant of paying his foreman's salary while the deal was in the making, and that Alcorn would be terribly embarrassed to reverse himself. When the September 1 payment was not made, plaintiff told defendant to exercise patience because Alcorn was raising sufficient money from an organization in Chicago to pay $58,000 in escrow. Defendant then verbally extended the time for the payment—no date was agreed upon for the extension. Thereafter defendant told Alcorn that he (Alcorn) would have to give possession of the ranch to defendant. There was no conversation between him and Alcorn regarding the closing of escrow but defendant paid the escrow charges. Alcorn told defendant, on one occasion, that he had a trust fund and could not break it and later told him that he did not have a trust fund. During the latter part of Alcorn's occupancy of the ranch, he (Alcorn) "admitted" that he did not have a dime. Defendant did not state in October, 1950, or at any other time, that plaintiff had earned his commission and should be paid. Defendant did not tell plaintiff that he had closed the deal with Alcorn. Plaintiff told defendant to

stay away from Alcorn; that he was temperamental and plaintiff would handle him.

Appellants (defendants) contend that, under the terms of the offer and acceptance agreement, payment of a commission was contingent upon the property being *disposed of* within six month after executing the agreement; that the property was not disposed of within that time or at all, and no commission became due. They assert that the escrow instructions are consistent with their interpretation of said agreement, since it was provided in the instructions that appellants would pay commission "at close of escrow."

Respondent (plaintiff) asserts that his claim to commission is based solely upon the offer and acceptance agreement; that he so stated in his opening brief in the trial court, and in his opposition to a demurrer, and in a letter to the trial judge; and that the court rested its decision entirely on the offer and acceptance agreement.

The portion of the offer and acceptance agreement which related to the payment of commission, as above shown, was as follows: "We agree to pay EARL G. BIEG 7½% commission if we dispose of such property to the maker of such offer, or his nominee, within six (6) months from the date hereof, on any terms or conditions, even if EARL G. BIEG does not consumate (sic) the transaction." It therefore appears that a commission would become payable under a certain condition or upon the happening of a specified event, that is, if defendants disposed of the property within six months. ▇▇ The court made no finding as to whether the property had been disposed of. Such a finding was necessary for a proper determination of the issues. Also, such a finding would have to be based upon the understanding or intention of the parties with respect to the meaning of the words "dispose of" as used in the agreement. There was no finding as to the understanding or intention of the parties with respect to the meaning of those words. ▇▇ In the absence of evidence to show otherwise, it is to be assumed that the parties intended that those words should be given their usual and ordinary meaning. According to Webster's Dictionary (1950) those words mean: "To get rid of; to put out of the way; to finish with; . . . To transfer to the control of someone else, as by selling; to alienate; part with; relinquish; bargain away." Plaintiff argues to the effect that the word "dispose" has many meanings, and that defendants disposed of the property, within the meaning of the agreement, by reason

of the following acts: executing escrow instructions, delivering possession of property to Alcorn, and extending time for the payment of the deposit. ▮ It cannot be concluded as a matter of law from the findings which were made, with respect to the escrow, possession of the property, extending time, or other facts, that the property was disposed of within the meaning of the agreement. Also, it cannot be said as a matter of law from the evidence that the property was disposed of. As above shown, the offer and acceptance agreement, which was prepared by plaintiff, had a provision therein that defendants would pay the commission if they dispose of the property within six months, "even if EARL G. BIEG does not *consumate* (sic) the transaction." (Italics added.) The words within those quotation marks indicate that it was contemplated that the transaction should be consummated by someone before a commission would become payable, and in the event it was consummated plaintiff would be entitled to commission even though he did not consummate it. When the words "dispose of" are considered in connection with the word "consummate," which is in the same sentence with those words, it would seem that the parties intended that the words "dispose of" should be synonymous with the word "consummate." If such a meaning was intended, then it would appear that plaintiff would not be entitled to a commission unless the sale to Alcorn was consummated. As stated in *McGill* v. *Fleming*, 32 Cal.App.2d 601 [90 P.2d 341] at page 604: "The word 'consummate' means to bring to completion." In *Hodges* v. *Lewis*, 112 Cal.App.2d 526 [246 P.2d 676], it was said at page 528: "The right of a broker to recover commission must be measured primarily by the terms of his employment. [Citations.] As above shown, it was specifically provided in the commission agreement that, in consideration of plaintiff's efforts to negotiate the sale of the property to Safeway Stores, the defendant would give to plaintiff 'upon final consummation of said sale' an option to purchase certain real property. It therefore appears that plaintiff's right to receive the option was contingent upon the happening of a certain event, namely, the final consummation of the sale." It was held therein that the sale was not consummated, and that defendant was not required to compensate plaintiff. It was also said therein at page 529: " 'When a condition precedent is adopted by contracting parties in their agreement, the court will exact a substantial if not a strict observance of the provisions of the agreement

before ordering a judgment thereon.'" The failure to find whether the property had been disposed of was a failure to find upon a controlling factual question in the case. Also, the failure to find what the parties understood or intended by the words "dispose of" was a failure to find upon another principal issue in the case. In *Commeford* v. *Baker*, 127 Cal.App.2d 111 [273 P.2d 321], plaintiffs were entitled, under a contract, to commissions of 6 per cent on gross sales but there was no finding as to the understanding or intention of the parties with respect to the meaning of "gross sales." The court said therein at page 120: "We therefore have no finding upon the one issue of fact upon which plaintiffs' right to commissions depends. It is a settled rule of appellate procedure that a judgment may not stand in the absence of findings on the material issues which support the judgment."

The court herein did find that the commission became payable on the date of the sale which was June 1, 1950, when defendants signed the acceptance agreement. The provision for payment of a commission is in said acceptance agreement which was prepared and submitted by plaintiff. Plaintiff emphasizes, as above shown, that he relies solely on the offer and acceptance agreement. It must be assumed that there was some object in providing therein that defendants agree to pay commission *"if* we dispose of such property . . . within *six (6) months from the date hereof* [June 1, 1950]." (Italics added.) The finding that the commission became payable on June 1, 1950, the date the acceptance was signed is in direct conflict with defendants' written agreement that they would pay commission *if they disposed of* the property within six months from June 1, 1950. That provision in the agreement was a condition precedent and the defendants' liability for a commission was contingent upon the fulfillment of the condition. In view of said provision which expressly made the payment of commission dependent upon a future occurrence, the said finding to the effect that commission became payable *immediately when defendants signed the agreement* is not supported by the evidence.

In *Commeford* v. *Baker, supra,* 127 Cal.App.2d 111, it said at page 121: "No just decision of the cause is possible without a determination by a trial court, after the receipt of all proper evidence, as to the meaning the parties attributed to the term 'gross sales' as used in the contract." In the present case, a similar statement with respect to the meaning of the words "dispose of" is appropriate. No just decision

of this cause is possible without a determination by a trial court (1) as to the meaning the parties attributed to the words "dispose of" as used in the agreement, and (2) whether the defendants disposed of the property within six months or at all after June 1, 1950.

By reason of the above conclusions, it is not necessary to discuss other contentions.

The judgment is reversed, and the cause is remanded for a new trial.

Shinn, P. J., and Vallée, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 16, 1955.